IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARSHALL GILLMORE,<br>    Plaintiff, | : <br> : <br> : |
| v. | :    CIVIL ACTION NO. 19-CV-5571 |
| MARIROSA LAMAS, *et al.*,<br>    Defendants. | : <br> : <br> : |

**MEMORANDUM**

JONES, J.                                                             DECEMBER/2, 2019

Plaintiff Marshall Gillmore, a prisoner incarcerated at SCI Chester, brings this *pro se* civil action pursuant to 42 U.S.C. § 1983, against eleven prison officials primarily based on having been housed in a dry cell for a six-day period. He seeks to proceed *in forma pauperis*. For the following reasons, the Court will grant Gillmore leave to proceed *in forma pauperis*, dismiss certain of his claims, and permit him to proceed against six Defendants on claims related to the dry cell. The Court will also give Gillmore an opportunity to amend certain of the dismissed claims prior to directing service of his Complaint.

**I.    FACTUAL ALLEGATIONS**

Gillmore primarily raises constitutional claims based on his placement in and the conditions of a dry cell where he was held for a period of approximately six days. He has named the following individuals as Defendants in their individual and official capacities: (1) Superintendent Marirosa Lamas; (2) Deputy Superintendent Kenneth Eason; (3) Security Captain Lorie Eason; (4) Lieutenant D. Friend; (5) Lieutenant B. Adams; (6) Lieutenant A. White; (7) Lieutenant K. Kaiser; (8) Lieutenant P. Bocco; (9) Sergeant C. Dunlap; (10) Grievance Coordinator M. Quinn; and (11) R.N. Green.

1

Gillmore alleges that on August 4, 2019, two officers who are not named as Defendants searched him for contraband. It appears he was also strip-searched. Although the search did not yield any contraband, Gillmore was handcuffed and "transported to the X-Ray Body Scanner located in the Institution's Visiting Search area." (Compl. at 4, ¶ 14.) The Complaint suggests that Gillmore was x-rayed and that the x-ray did not reflect any contraband on him or inside of him. (*Id.*)

Gillmore was then transported to Defendant Lorie Eason's office. (*Id.* at 4, ¶ 15.) Eason "insisted that [Gillmore] swallowed something" despite his denials and the search results, so she ordered that he be taken to a "dry cell" for observation.[1] (*Id.* at 5, ¶ 16.) Gillmore was forced to remove his clothing and surrender his belongings, and was given only a "paper thin" white smock to wear. (*Id.* at 5, ¶ 19.) At the direction of Defendant Friend, Gillmore was shackled and chained around the waist; the shackles dug into Gillmore's skin and the lock around Gillmore's waist caused him "excruciating pain. (*Id.* at 5-6, ¶ 20.) Gillmore's hands were also placed in a bag and zip-tied, and he was left in the fetal position, "unable to move because of the restraints he was placed in." (*Id.* at 5-6, ¶¶ 20-21.)

---

[1] As generally explained by the United States Court of Appeals for the Third Circuit:

> A "dry cell" is a cell that lacks water—all standing water has been drained from the toilet, the room's water supply has been shut off, and the sink and toilet have been capped to prevent inmate access. An inmate may be placed in a dry cell when prison staff have observed the inmate attempt to ingest an item of contraband or they learn that the inmate is attempting to introduce contraband into the prison. Dry cells are used to closely observe the inmate until natural processes allow for the ingested contraband to be retrieved. To this end, dry cells lack all linens and moveable items other than a mattress, inmates' clothes are exchanged for a simple smock, and their movements are carefully controlled to prevent them from concealing or disposing of any retrievable contraband.

*Thomas v. Tice*, --- F.3d ---, No. 18-1811, 2019 WL 5884162, at *1 (3d Cir. Nov. 12, 2019).

2

Gillmore was held in the cell for approximately six days. (*Id.* at 5, ¶ 17; *see also id.* at 7, ¶ 27.) He alleges that, during that time, the cell was "freezing cold" with cold air blowing on him, but also that there was "poor ventilation," he was given only a soiled mattress with no sheets, just a blanket, and the lights were constantly on, subjecting him to constant illumination. (*Id.* at 6, ¶¶ 23-24.) As is the case in a dry cell, *see supra note* 1, Gillmore alleges that the toilet and plumbing did not work, so he was required to urinate in a bottle and defecate in a pan, so officers could search his waste. (*Id.* at 6, ¶ 25.) He also was not provided with water to wash his hands, sanitizer, a shower, toothpaste, undergarments, or socks. (*Id.* at 6, ¶ 28.) Gillmore also generally alleges that during this time, Defendants White, Adams, Kaiser, Friend and Dunlap "all took turns and [participated] in torturing [him] with malicious, sadistic use of force." (*Id.* at 5, ¶ 17.) However, Gillmore also avers that Defendant Dunlap stated, "This procedure is not suppose[d] to be practiced in SCI-Chester, They're not suppose[d] to be doing this," and left him in the dry cell without taking any further action. (*Id.* at 7, ¶ 29.)

Gillmore alleges that he complained of pain from the restraints. Defendant Adams allegedly dismissed his complaints and threatened to prevent Gillmore from moving for twenty-four hours if he continued to complain. (*Id.* at 7-8, ¶ 31.) Defendant Kaiser also allegedly prevented Gillmore from moving "at all." (*Id.* at 8, ¶ 33.) At some point during Gillmore's stay in the dry cell, Defendant Nurse Green observed his feet swelling from the shackles but did not provide any treatment and did not direct the officers to loosen the shackles. (*Id.* at 8, ¶ 34.) Gillmore alleges that no contraband was recovered during his stay in the dry cell or detected after a second x-ray body scan. (*Id.* at 8, ¶ 35.)

On August 9, 2019, Gillmore was moved to the Restricted Housing Unit ("RHU") in the same smock he was given in the dry cell. (*Id.* at 8, ¶ 35.) He was held in solitary confinement

3

even though he had not committed a disciplinary infraction. (*Id.*) On August 13, 2019, Nurse Green photographed Gillmore's hands and feet even though the swelling from the restraints had subsided. (*Id.* at 9, ¶ 36.) Gillmore also alleges that, while Defendant Bocco was "doing a tour," he told Bocco about "the pain and [trauma] he just experienced." (*Id.* at 9, ¶ 37.) Bocco allegedly responded that Gillmore was "our first victim" and laughed as though Gillmore's "hardship was a joking one." (*Id.*) Gillmore was released from the RHU on August 30, 2019. (*Id.* at 12, ¶ 48.)

Thereafter, Gillmore discussed his experience with Defendant Kenneth Eason, who allegedly stated that he would look into the matter but failed to do so. (*Id.* at 10, ¶ 45.) Gillmore also filed a grievance while he was in the RHU based on the loss of his property and the conditions to which he had been subjected, but Defendant Quinn, the facility's grievance coordinator, only addressed the matter of Gillmore's property and denied his grievance. (*Id.* at 9-10, ¶¶ 40-41; *see also id.* at 11, ¶¶ 46-47.) Gillmore refiled his grievance upon his release from the RHU, which he alleges he was entitled to do under DOC policy. (*Id.* at 12, ¶ 48.) However, Lamas mistakenly construed his refiled grievance as an appeal; Gillmore also alleges that Lamas "failed to react" to the issues he presented in his grievance or to respond to his complaints. (*Id.* at 12, ¶ 49; *see also id.* at 9-10, ¶ 41.)

Gillmore alleges that he suffered trauma, humiliation, depression, confusion, pain at the point of the restraints, and continues to suffer from numbness in his thumbs. He also experienced psychological problems and was prescribed medication as a result. (*Id.* at 10, ¶ 43.) Gillmore also claims he was subjected to retaliation based on an allegation that his cell was "searched multiple times" between August 30, 2019 and September 30, 2019, and his "grievance

4

documents [were] stolen." (*Id.* at 12, ¶ 50.) Gillmore seeks compensatory and punitive damages.

## II. STANDARD OF REVIEW

The Court grants Gillmore leave to proceed *in forma pauperis* because it appears that he is incapable of paying the fees to commence this civil action.[2] Accordingly, 28 U.S.C. § 1915(e)(2)(B)(ii) applies, which requires the Court to dismiss the Complaint if it fails to state a claim. Whether a complaint fails to state a claim under § 1915(e)(2)(B)(ii) is governed by the same standard applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), *see Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999), which requires the Court to determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). Conclusory allegations do not suffice. *Id.* As Gillmore is proceeding *pro se*, the Court construes his allegations liberally. *Higgs v. Att'y Gen.*, 655 F.3d 333, 339 (3d Cir. 2011).

## III. DISCUSSION

The Court understands Gillmore to be raising constitutional claims pursuant to § 1983 based on his placement in the dry cell, the conditions of the dry cell, the manner in which he was restrained, the denial of medical care while he was in the dry cell, his placement in the RHU, the failure of certain Defendants to respond to his plight, the responses to his grievances, and the searches of his cell on an allegedly retaliatory basis. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and

---

[2] However, as Gillmore is a prisoner, he will be obligated to pay the filing fee in installments in accordance with the Prison Litigation Reform Act. *See* 28 U.S.C. § 1915(b).

5

must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). "A defendant in a civil rights action must have personal involvement in the alleged wrongs" for liability to attach under § 1983. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *see also Iqbal*, 556 U.S. at 676 (explaining that, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

## A. Claims Against the Defendants in Their Official Capacities

All of the Defendants are identified as employees of the Department of Corrections at SCI-Chester except for Defendant Green, who is identified as a nurse with Correct Care Solution, which contracts with the Department of Corrections. (Compl. at 2-4.) States are not considered "persons" for purposes of § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65-66 (1989). Furthermore, the Eleventh Amendment bars suits against a state and its agencies in federal court when the state has not waived that immunity. *Id.* "Because the Commonwealth of Pennsylvania's Department of Corrections is a part of the executive department of the Commonwealth, it shares in the Commonwealth's Eleventh Amendment immunity." *Lavia v. Pa. Dep't of Corr.*, 224 F.3d 190, 195 (3d Cir. 2000). Suits against state officials acting in their official capacities are really suits against the employing government agency, and as such, are also barred by the Eleventh Amendment. *A.W. v. Jersey City Public Schools*, 341 F.3d 234, 238 (3d Cir. 2003); *see also Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Will*, 491 U.S. at 70-71.

As the Commonwealth has not waived its Eleventh Amendment immunity, *see* 42 Pa. Cons. Stat. § 8521-22, Commonwealth officials sued in their official capacities under § 1983 are

6

immune from suits filed in federal court. Accordingly, the Court will dismiss Gillmore's official capacity claims against the Defendants employed by the Department of Corrections.

As to Gillmore's claims against Green in her official capacity, official capacity claims are indistinguishable from claims against the entity that employs the officials. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'") (quoting *Monell v. N.Y.C. Dept. of Soc. Servs.*, 436 U.S. 658, 690, n. 55 (1978)). In other words, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* Accordingly, the official capacity claims against Green must be treated as claims against Correct Care Solution, a contractor with the Department of Corrections.

"[A] private health company providing services to inmates 'cannot be held responsible for the acts of its employees under a theory of respondeat superior or vicarious liability.'" *Sims v. Wexford Health Sources*, 635 F. App'x 16, 20 (3d Cir. 2015) (quoting *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 583 (3d Cir. 2003)). Rather, in order to hold a private health care company liable for a constitutional violation under § 1983, Gillmore must allege the provider had "a relevant . . . policy or custom, and that the policy caused the constitutional violation [he] allege[s]." *Natale*, 318 F.3d 575, 583-84 (citing *Bd. of the County Comm'rs of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 404 (1997)); *see also Lomax v. City of Philadelphia*, Civ. A. No. 13-1078, 2017 WL 1177095, at *3 (E.D. Pa. Mar. 29, 2017) ("Because [defendant] is a private company contracted by a prison to provide health care for inmates, . . . it can only be held liable for constitutional violations if it has a custom or policy exhibiting deliberate indifference to a prisoner's serious medical needs.") (citations and quotations omitted). "To satisfy the pleading standard, [the plaintiff] must . . . specify what exactly that

custom or policy was." *McTernan v. City of York, PA*, 564 F.3d 636, 658 (3d Cir. 2009). As the Complaint does not contain any allegations suggesting that any of the events giving rise to Gillmore's claims against Green stemmed from a policy or custom of Correct Care Solution, the Court will dismiss his claims against Green in her official capacity.

### B. Retaliation Claims

The only factual basis for Gillmore's retaliation claims is his allegation his cell was "searched multiple times" between August 30, 2019 and September 30, 2019, and his "grievance documents [were] stolen." (Compl. at 12, ¶ 50.) "To state a claim for retaliation, a prisoner must allege that: (1) he was engaged in constitutionally protected conduct, (2) 'he suffered some adverse action at the hands of prison officials,' and (3) 'his constitutionally protected conduct was a substantial or motivating factor in the decision' to take that action." *Wisniewski v. Fisher*, 857 F.3d 152, 156 (3d Cir. 2017) (quoting *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001)) (internal quotations omitted). Gillmore does not explain how any of the named Defendants were personally involved in the events related to the searches of his cell or the loss of his grievances. Furthermore, although filing a grievance against prison officials constitutes protected conduct, *see Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016), Gillmore does not clearly allege that he was being retaliated against for filing grievances, as opposed to some other conduct. In sum, Gillmore has not alleged a plausible basis for a retaliation claim against the Defendants based on the searches of his cell.

### C. Claims Based on Placement in the RHU

Gillmore primarily challenges his placement in the dry cell and the conditions to which he was subjected while he was in the dry cell, but the Court also understands him to be challenging his placement in the RHU. However, Gillmore does not allege how any of the

8

named Defendants were personally involved in his placement in the RHU. Rather, most of his allegations are focused on the events related to his experience in the dry cell and certain Defendants' participation in those events. As it is not clear from the Complaint how any of the named Defendants were personally involved in Gillmore's placement in the RHU, he has not stated a plausible claim against them related to having been housed there.

### D. Claims Against Defendants Quinn and Lamas

Gillmore's claims against Defendants Quinn and Lamas are based entirely upon how those Defendants handled his grievances. "Prison inmates do not have a constitutionally protected right to a grievance process."[3] *See Jackson v. Gordon*, 145 F. App'x 774, 777 (3d Cir. 2005) (per curiam); *see also Caldwell v. Beard*, 324 F. App'x 186, 189 (3d Cir. 2009) (per curiam). Furthermore, "[m]erely responding to or reviewing an inmate grievance does not rise to the level of personal involvement necessary to allege an Eighth Amendment deliberate indifference claim." *Tenon v. Dreibelbis*, 606 F. App'x 681, 688 (3d Cir. 2015) (per curiam); *Curtis v. Wetzel*, 763 F. App'x 259, 263 (3d Cir. 2019) (per curiam) ("The District Court properly determined that Defendants Wenerowicz, Lewis, and Shaylor – who participated only in the denial of Curtis' grievances – lacked the requisite personal involvement [in the conduct at issue]."); *Folk v. Prime Care Med.*, 741 F. App'x 47, 51 (3d Cir. 2018) (per curiam) ("Although some of these defendants were apparently involved in responding to some of Folk's prison grievances, there are no allegations linking them to the underlying incidents and thus no basis for liability based on those later grievance reviews.").

---

[3] "While prisoners do have a constitutional right to seek redress of their grievances from the government, that right is the right of access to the courts which is not compromised by the failure of prison officials to address an inmate's grievance." *Daniels v. Pitkins*, Civ. A. No. 14-2383, 2017 WL 890090, at *3 (M.D. Pa. Mar. 6, 2017).

9

Gillmore does not allege that Quinn and Lamas were personally involved in the events that led to his placement in the dry cell, the conditions in that cell, or any of the other prison conditions that form the bases for his claims. Rather, Gillmore's claims are based on allegations that Defendants Quinn and Lamas denied or mishandled grievances he filed about those conditions. However, mishandling or denying a grievance neither states a claim based on the events complained of in the grievance nor states an independent basis for a constitutional claim. For those reasons, Gillmore's claims against Defendants Quinn and Lamas will be dismissed because they are not plausible.

### E. Claims Against Defendant Kenneth Eason

Gillmore has also failed to state a claim against Defendant Kenneth Eason. Gillmore's only allegation against this Defendant is that he discussed his experience with Eason after his release from the RHU, and Eason represented he would look into the matter but failed to do so. (Compl. at 10, ¶ 45.) In other words, Gillmore alleges that Kenneth Eason failed to conduct an investigation into the alleged abuses after they occurred. However, "an allegation of a failure to investigate, without another recognizable constitutional right, is not sufficient to sustain a section 1983 claim." *Graw v. Fantasky*, 68 F. App'x 378, 383 (3d Cir. 2003) (quotations omitted); *see also Boseski v. N. Arlington Municipality*, 621 F. App'x 131, 135 (3d Cir. 2015) (per curiam) ("Boseski has no cognizable claim against a government entity for its failure to investigate or bring criminal charges against another individual."); *Mitchell v. McNeil*, 487 F.3d 374, 378 (6th Cir. 2007) ("There is no statutory or common law right, much less a constitutional right, to an investigation."). Accordingly, the Court will dismiss Gillmore's claims against Kenneth Eason for failure to state a plausible claim.

## F. Claims Against Defendant Bocco

Gillmore's only allegation against Defendant Bocco is that, after he told Bocco about his experience in the dry cell, Bocco responded that Gillmore was "our first victim" and made light of Gillmore's experience.[4] (Compl. at 9, ¶ 37.) "Verbal harassment of a prisoner, although distasteful, does not violate the Eighth Amendment." *Washington v. Rozich*, 734 F. App'x 798, 801 (3d Cir. 2018) (per curiam) (citing *McBride v. Deer*, 240 F.3d 1287, 1291 n.3 (10th Cir. 2001) and *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000)). While comments such as the one alleged may be unprofessional and inappropriate, they do not amount to constitutional violations. As Bocco's verbal response to Gillmore is the only basis for Gillmore's claims against him, Gillmore has failed to state a claim against Bocco.

## G. Claims Against Defendant White

Gillmore's only allegation against Defendant White is a generalized allegation that, during his placement in the dry cell, Defendants White, Adams, Kaiser, Friend and Dunlap "all took turns and [participated] in torturing [him] with malicious, sadistic use of force." (Compl. at 5, ¶ 17.) Gillmore does not allege what White specifically did (or did not do) or how White used force against him during his incarceration in the dry cell. Because this allegation is too conclusory on its own to support a claim against White, the Court will dismiss Gillmore's claims against White as pled.

---

[4] It is not clear whether Gillmore was in the RHU at the time of his encounter with Bocco or whether he was housed elsewhere.

## H. Remaining Claims

Gillmore's remaining claims are against Defendants Lorie Eason, Friend, Adams, Kaiser, Dunlap, and Green related to his placement in the dry cell, the conditions in the dry cell, having been restrained in a manner that caused injury, and the denial of medical care for those injuries.

Conditions of confinement violate the Eighth Amendment's prohibition on cruel and unusual punishment if they satisfy two criteria.[5] First, the conditions "must be, objectively, sufficiently serious" such that a "prison official's act or omission . . . result[s] in the denial of the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citations and internal quotation marks omitted). Second, the official responsible for the challenged conditions must exhibit a "sufficiently culpable state of mind," which "[i]n prison-conditions cases . . . is one of deliberate indifference to inmate health or safety." *Id.* "[E]ven though administrative confinement in a dry cell is unpleasant and often unsanitary, so long as the conditions of that confinement are not foul or inhuman, and are supported by some penological justification, they will not violate the Eighth Amendment." *Thomas*, 2019 WL 5884162, at *3.

To state a constitutional claim based on the failure to provide medical treatment, a prisoner must allege facts indicating that prison officials were deliberately indifferent to his serious medical needs. *See Farmer*, 511 U.S. at 835. A prison official is not deliberately indifferent "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. "A medical need is serious, . . . if it is one that has been diagnosed by a physician as requiring

---

[5] It appears that Gillmore was a convicted and sentenced inmate at the time of the events in question, such that the Eighth Amendment governs his claims. *See Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012).

12

treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotations omitted). Deliberate indifference has been found "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

"After conviction, the Eighth Amendment serves as the primary source of substantive protection in cases where an inmate challenges a prison official's use of force as excessive and unjustified." *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000). In the excessive force context, "the central question is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). "In determining whether a correctional officer has used excessive force in violation of the Eighth Amendment, courts look to several factors including: (1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) 'the extent of injury inflicted'; (4) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them'; and (5) 'any efforts made to temper the severity of a forceful response.'" *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 327 (1986)).

At this early stage of the litigation, Gillmore may proceed on his claims against Defendants Lorie Eason, Friend, Adams, Kaiser, Dunlap, and Green based on their involvement in the events related to his placement in the dry cell, the use of force related to his placement in the dry cell, the conditions in the dry cell, and the alleged denial of medical care while he was in

13

the dry cell.[6] *See Young v. Quinlan*, 960 F.2d 351, 365 (3d Cir. 1992) ("When viewed in their totality, the alleged actions of Lewisburg prison officials - not allowing Young to leave his cell more than once to defecate or urinate over a period of several days, not providing Young with a plastic urinal for 29 hours, not allowing Young to empty his urinal more than twice, not allowing Young to wash his hands before eating, not allowing Young to bathe or shower, not providing Young with toilet paper despite his diarrhea, not providing Young with water to drink, suggesting instead that he drink his urine, and the mocking taunts by guards and their threats to chain Young to a steel slab if he complained about his conditions—would if proved demonstrate a violation of the basic concepts of humanity and decency that are at the core of the protections afforded by the Eighth Amendment."), *superseded by statute on other grounds as stated in Nyhuis v. Reno*, 204 F.3d 65, 71 n.7 (3d Cir. 2000). The Complaint alleges and plausibly infers that these individuals were aware of and, at least to some extent involved in and responsible for the events and conditions that form the primary basis for Gillmore's claims. Gillmore has also alleged sufficient information about the events leading up to his placement in the dry cell, the conditions therein, the use of force against him, and the denial of treatment for his injuries to proceed at this time.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant Gillmore leave to proceed *in forma pauperis* and dismiss with prejudice his official capacity claims against the Defendants employed by the Department of Corrections. The Court will dismiss the following claims without

---

[6] Gillmore's claim against Dunlap appears more akin to a failure to intervene based on his alleged knowledge of Gillmore's circumstances. *See Smith v. Mensinger*, 293 F.3d 641 (3d Cir. 2002) (acknowledging an officer's duty to intervene to protect a victim from another officer's use of excessive force "if there is a realistic and reasonable opportunity" to do so).

14

prejudice: (1) claims against Green in her official capacity; (2) all retaliation claims; (3) all claims based on Gillmore's placement in the RHU; and (4) all claims against Defendants Quinn, Lamas, Kenneth Eason, Bocco, and White. As it is possible Gillmore could allege additional facts to cure the defects in the claims the Court dismisses without prejudice, he will be given an opportunity to file an amended complaint. If Gillmore chooses not to file an amended complaint, the Court will direct service on Defendants Lorie Eason, Friend, Adams, Kaiser, Dunlap, and Green so Gillmore may proceed on his remaining claims against them. An appropriate Order follows, which provides further instruction as to amendment.

BY THE COURT:

_____
C. DARNELL JONES, II, J.

ENT'D DEC 1 6

xC: Warden