# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARSHALL GILLMORE, : | |
|     Plaintiff, : | |
| : | |
| v. : | CIVIL ACTION NO. 19-CV-5571 |
| : | |
| MARIROSA LAMAS, *et al.*, : | |
|     Defendants. : | |

## MEMORANDUM

JONES, J.                                                                                                          February 10, 2020

        Plaintiff Marshall Gillmore, a prisoner incarcerated at SCI Chester, filed an Amended Complaint pursuant to 42 U.S.C. § 1983, against eleven prison officials primarily based on having been housed in a dry cell for a six-day period. For the following reasons, the Court will dismiss certain of Gillmore's claims, and permit him to proceed on his remaining claims.

## I.     FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY

        Gillmore's initial Complaint primarily raised constitutional claims based on his placement in and the conditions of a dry cell where he was held for a period of approximately six days. He also raised claims based on his placement in the Restricted Housing Unit ("RHU"), retaliation, and the handling of his grievances. He named the following individuals as Defendants in their individual and official capacities: (1) Superintendent Marirosa Lamas; (2) Deputy Superintendent Kenneth Eason; (3) Security Captain Lorie Eason; (4) Lieutenant D. Friend; (5) Lieutenant B. Adams; (6) Lieutenant A. White; (7) Lieutenant K. Kaiser; (8) Lieutenant P. Bocco; (9) Sergeant C. Dunlap; (10) Grievance Coordinator M. Quinn; and (11) R.N. Green.

1

In a December 13, 2019 Memorandum and Order, the Court granted Gillmore leave to proceed *in forma pauperis* and screened his Complaint pursuant to 28 U.S.C. § 1915(e)(2)(B). (ECF Nos. 5 & 6.) First, the Court dismissed Gillmore's claims against the Defendants in their official capacities. Second, the Court concluded that Gillmore failed to state a retaliation claim in connection with allegations about searches of his cell and the handling of his grievances. Third, Gillmore failed to state a claim based on his placement in the RHU because he failed to allege how any of the named Defendants were personally responsible for the events giving rise to that claim. Fourth, Gillmore failed to state a claim against Defendants Quinn and Lamas because those Defendants were only alleged to have mishandled grievances, which is not a basis for a plausible constitutional claim. Fifth, Gillmore failed to state a claim against Defendant Kenneth Eason who was only alleged to have failed to conduct an investigation upon being told about what happened to Gillmore after the fact, which did not equate to a constitutional violation. Sixth, Gillmore failed to state a claim against Defendant Bocco, who was only alleged to have made a statement to Gillmore, and Defendant White, whose participation in events was alleged in a conclusory fashion. However, the Court concluded that Gillmore could proceed on his remaining claims against six Defendants "related to his placement in the dry cell, having been restrained in a manner that caused injury, and the denial of medical care for those injuries." (ECF No. 5 at 12.)

The Court gave Gillmore leave to file an amended complaint, which he did after receiving an extension of time. The Amended Complaint names the same eleven Defendants as

the initial Complaint.¹ Gillmore's allegations are similar to but somewhat more developed than the allegations of the initial Complaint.

Gillmore alleges that on August 4, 2019, two officers who are not named as Defendants searched him for contraband. Although the search did not yield any contraband, Gillmore was handcuffed, strip-searched, and subjected to an internal x-ray. (Am. Compl. ECF No. 9 at 5, ¶ 17.) The strip-search and x-ray did not yield any contraband, but Defendant Lorie Eason nevertheless "insisted that [Gillmore] swallowed contraband" and ordered that he be taken to a "dry cell" for observation.² (Am. Compl. ECF No. 9 at 6, ¶¶ 19-20.) Gillmore was forced to

---

¹ In the caption of the Amended Complaint, Gillmore indicates he is only suing the Defendants in their individual capacities. (Am. Compl. ECF No. 9 at 1.) However, in the body of the Amended Complaint, he indicates he is suing the Defendants in their individual and official capacities. (*Id.* at 5.) To the extent he intended to raise claims against the Defendants in their official capacities, those claims fail.

"Because the Commonwealth of Pennsylvania's Department of Corrections is a part of the executive department of the Commonwealth, it shares in the Commonwealth's Eleventh Amendment immunity." *Lavia v. Pa. Dep't of Corr.,* 224 F.3d 190, 195 (3d Cir. 2000). Suits against state officials acting in their official capacities are really suits against the employing government agency, and as such, are also barred by the Eleventh Amendment. *A.W. v. Jersey City Public Schools*, 341 F.3d 234, 238 (3d Cir. 2003); *see also Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Will*, 491 U.S. at 70-71. Accordingly, Gillmore's official capacity claims against the Defendants who are employed by SCI-Chester must be dismissed.

Defendant Green appears to be employed by a medical contractor, so official capacity claims against her would essentially be claims against the contractor. "[A] private health company providing services to inmates 'cannot be held responsible for the acts of its employees under a theory of respondeat superior or vicarious liability.'" *Sims v. Wexford Health Sources*, 635 F. App'x 16, 20 (3d Cir. 2015) (quoting *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 583 (3d Cir. 2003)). Rather, in order to hold a private health care company liable for a constitutional violation under § 1983, Gillmore must allege the provider had "a relevant . . . policy or custom, and that the policy caused the constitutional violation [he] allege[s]." *Natale*, 318 F.3d 575, 583-84 (citing *Bd. of the County Comm'rs of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 404 (1997)). He has not done so here.

² As generally explained by the United States Court of Appeals for the Third Circuit:

> A "dry cell" is a cell that lacks water—all standing water has been drained from the toilet, the room's water supply has been shut off, and the sink and toilet have been capped to prevent inmate access. An inmate may be placed in a dry cell when prison staff have

3

remove his clothing and surrender his belongings, and was given only a "paper thin" white smock to wear. (*Id.* at 7, ¶ 25.) At the direction of Defendant Friend, Gillmore was shackled and chained around the waist; the shackles dug into Gillmore's skin and the lock around Gillmore's waist caused him "excruciating pain." (*Id.* at 7, ¶ 26.) Gillmore's hands were also placed in a bag and zip-tied, and he was left in the fetal position, "unable to move because of the restraints he was forced into." (*Id.* at 7-8, ¶¶ 27-28.)

Gillmore was held in the cell for approximately six days. He alleges that, during that time, the cell was "freezing cold" with cold air blowing on him, but also that there was "poor ventilation," he was given only a soiled mattress with no sheets, just a blanket, and the lights were constantly on, subjecting him to constant illumination. (*Id.* at 8, ¶¶ 29-32.) As is the case in a dry cell, *see supra note* 1, Gillmore alleges that the toilet and plumbing did not work, so he was required to urinate in a bottle and defecate in a pan, so officers could search his waste. (*Id.* at 8-9, ¶¶ 33.) He also was not provided with water to wash his hands, sanitizer, a shower, toothpaste, undergarments, or socks during this time. (*Id.* at 10, ¶ 39.) Gillmore also alleges that he was denied his regular medication while in the dry cell, although the nature of Gillmore's medication is not clear. (*Id.* at 10, ¶ 40.)

Gillmore appears to be alleging that Defendants White, Adams, Kaiser, Friend and Dunlap were involved in the events taking place over the six days he was held in the dry cell and

---

> observed the inmate attempt to ingest an item of contraband or they learn that the inmate is attempting to introduce contraband into the prison. Dry cells are used to closely observe the inmate until natural processes allow for the ingested contraband to be retrieved. To this end, dry cells lack all linens and moveable items other than a mattress, inmates' clothes are exchanged for a simple smock, and their movements are carefully controlled to prevent them from concealing or disposing of any retrievable contraband.

*Thomas v. Tice*, No. 18-1811, 2020 WL 219036, at *1 (3d Cir. Jan. 15, 2020).

were responsible for the conditions in the dry cell.  (*Id.* at 6-7, ¶ 23; *see also id.* at 22-23, ¶¶ 82-84.)  However, Gillmore also avers that Defendant Dunlap stated, "This procedure is not suppose[d] to be practiced in SCI-Chester, They're not suppose[d] to be doing this," and left him in the cell.  (*Id.* at 10, ¶ 42.)

Gillmore alleges that he complained of pain from the restraints.  Defendant Adams allegedly dismissed his complaints and threatened to prevent Gillmore from moving for twenty-four hours if he continued to complain.  (*Id.* at 11, ¶ 44.)  Defendant Kaiser asked Gillmore if he wanted to move, but left before Gillmore could answer.  (*Id.* at 11, ¶ 46.)  On one occasion, Gillmore told Defendant White that the restraints were hurting him, and White responded that "this is what he get[s] for not giving information . . . ."  (*Id.* at 11-12, ¶ 48.)  Gillmore also alleges that Defendant Nurse Green observed his feet swelling from the shackles and saw him shivering from the cold, but did not provide any treatment and did not direct the officers to loosen the shackles.  (*Id.* at 11, ¶ 47.)

On August 9, 2019, Defendant White transported Gillmore for a second x-ray, which yielded no contraband.  (*Id.* at 12, ¶¶ 49-50.)  Pursuant to an order from Defendant Lorie Eason, Gillmore was then moved to the Restricted Housing Unit ("RHU") and held in solitary confinement in the same smock he was given in the dry cell, even though he had not committed a disciplinary infraction.  (*Id.* at 12-13, ¶¶ 50-51.)

When Gillmore was not given his property in the RHU, he discussed the matter with Defendant Kaiser and was told that staff lost his property by leaving it on the housing unit after Gillmore was transferred to the dry cell, and that the property since disappeared; Kaiser allegedly stated, "File a grievance, you should of gave my Captain information."  (*Id.* at 13, ¶ 52.)  Gillmore alleges that he saw other inmates in the RHU receive their property and "knew he was

5

being retaliated against for not providing information to Defendant Captain Lorie, Eason."[3] (*Id.*) On August 10, 2019, Nurse Green photographed Gillmore's hands and feet even though the swelling from the restraints had subsided; Gillmore told Green that his thumbs were numb and his back "ached extremely bad" and was told to submit a request for sick call. (*Id.* at 13, ¶ 53.) Gillmore did so, but his request was ignored.

Gillmore also alleges that on August 20, 2019, while Defendant Bocco was "doing a tour," he told Bocco about "the pain and [trauma] he just went through." (*Id.* at 14, ¶ 55.) Bocco allegedly responded that Gillmore was "our first victim" and laughed. (*Id.*) Gillmore was released from the RHU on August 30, 2019. (*Id.* at 20, ¶ 70.)

Thereafter, Gillmore discussed his experience with Defendant Kenneth Eason, the Deputy Superintendent, who allegedly stated that he would look into the matter but failed to do so. (*Id.* at 16, ¶ 61.) Gillmore also filed a grievance while he was in the RHU based on the loss of his property and the conditions to which he had been subjected, but Defendant Quinn, the facility's grievance coordinator, only addressed the matter of Gillmore's property and denied his grievance. (*Id.* at 14, ¶ 58; *see also id.* at 19, ¶ 69.) Gillmore refiled his grievance but alleges that Defendant Lamas intentionally misconstrued the refiled grievance as an appeal. (*Id.* at 15, ¶ 59.) Gilmore also alleges that Quinn and Lamas ignored other grievances he filed, thereby interfering with the grievance process, and retaliated against him by ignoring his grievances

---

[3] This allegation is too conclusory and speculative to support a plausible claim that Lorie Eason retaliated against Gillmore in relation to his property. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (explaining that, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). It is also unclear whether Gillmore intended to raise such a claim. (*See* Am. Compl. ECF No. 9 at 23, ¶ 85 (discussing retaliation claims).)

and/or failing to properly respond to his grievances. (*Id.* at 14-15, ¶¶ 58-59; *see also id.* at 20, ¶ 72-73; *see also id.* at 23, ¶ 85.)

Gillmore also claims he was retaliated against in various respects. Gillmore avers that on November 9, 2019, Defendant Bocco retaliated against him for filing grievances and pursuing a lawsuit. He claims that he was getting a legal aid book from another inmate when Bocco backed him into the cell, required him to strip naked, and made sexual gestures and comments about Gillmore's penis. (*Id.* at 17-18, ¶ 66.) Bocco also allegedly stated that Gillmore needed to "stay in [his] lane" and that he was "trying to sue the wrong people." (*Id.*) Gillmore adds that Lamas also retaliated against him after he initiated the instant case based on the fact that he did not receive the Court's December 13, 2019 Memorandum and Order until December 27, 2019. (*Id.* at 18, ¶ 67.) Gillmore also claims he was subjected to retaliation based on an allegation that his cell was "search[ed] multiple times" between August 30, 2019 and September 30, 2019, and "some of his grievance documents" were taken.[4] (*Id.* at 21, ¶ 75.)

Gillmore alleges that he suffered various physical and psychological effects as a result of his placement in the dry cell. Gillmore seeks compensatory and punitive damages, and "no further retaliation." (*Id.* at 24.)

## II.   STANDARD OF REVIEW

As Gillmore is proceeding *in forma pauperis*, 28 U.S.C. § 1915(e)(2)(B)(ii) applies, which requires the Court to dismiss the Amended Complaint if it fails to state a claim. Whether a complaint fails to state a claim under § 1915(e)(2)(B)(ii) is governed by the same standard

---

[4] This allegation is comprised of one sentence in Gillmore's Amended Complaint and is not tied to any of the named Defendants. Accordingly, Gillmore has not stated a plausible claim against any Defendant based on the searches of his cell between August 30 and September 30, 2019. It is also unclear whether Gillmore intended to raise such a claim. (*See* Am. Compl. ECF No. 9 at 23, ¶ 85 (discussing retaliation claims).)

7

applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), *see Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999), which requires the Court to determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quotations omitted). Conclusory allegations do not suffice. *Id.* As Gillmore is proceeding *pro se*, the Court construes his allegations liberally. *Higgs v. Att'y Gen.*, 655 F.3d 333, 339 (3d Cir. 2011).

### III. DISCUSSION

The Court understands Gillmore to be raising constitutional claims pursuant to § 1983 based on his placement in the dry cell, the conditions in the dry cell, the manner in which he was restrained, the denial of medical care while he was in the dry cell, his placement in the RHU, the failure of certain Defendants to respond to his plight, the responses to his grievances, and alleged retaliation in various forms. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). "A defendant in a civil rights action must have personal involvement in the alleged wrongs" for liability to attach under § 1983. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *see also Iqbal*, 556 U.S. at 676 (explaining that, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

#### A. Claims Against Defendants Quinn and Lamas

Gillmore alleges that Quinn and Lamas ignored his grievances or mishandled them, thereby obstructing his access to the grievance process. "Prison inmates do not have a

constitutionally protected right to a grievance process."[5] *See Jackson v. Gordon*, 145 F. App'x 774, 777 (3d Cir. 2005) (per curiam); *see also Caldwell v. Beard*, 324 F. App'x 186, 189 (3d Cir. 2009) (per curiam). Furthermore, "[m]erely responding to or reviewing an inmate grievance does not rise to the level of personal involvement necessary to allege an Eighth Amendment deliberate indifference claim." *Tenon v. Dreibelbis*, 606 F. App'x 681, 688 (3d Cir. 2015) (per curiam); *Curtis v. Wetzel*, 763 F. App'x 259, 263 (3d Cir. 2019) (per curiam) ("The District Court properly determined that Defendants Wenerowicz, Lewis, and Shaylor – who participated only in the denial of Curtis' grievances – lacked the requisite personal involvement [in the conduct at issue]."); *Folk v. Prime Care Med.*, 741 F. App'x 47, 51 (3d Cir. 2018) (per curiam) ("Although some of these defendants were apparently involved in responding to some of Folk's prison grievances, there are no allegations linking them to the underlying incidents and thus no basis for liability based on those later grievance reviews.").

Gillmore does not allege that Quinn and Lamas were personally involved in the events that led to his placement in the dry cell, the conditions in that cell, or any of the other prison conditions that form the bases for his claims. Rather, Gillmore's claims are based on allegations that Defendants Quinn and Lamas denied or mishandled grievances he filed about those conditions. However, mishandling, ignoring or denying a grievance does not state a claim based

---

[5] "While prisoners do have a constitutional right to seek redress of their grievances from the government, that right is the right of access to the courts which is not compromised by the failure of prison officials to address an inmate's grievance." *Daniels v. Pitkins*, Civ. A. No. 14-2383, 2017 WL 890090, at *3 (M.D. Pa. Mar. 6, 2017); *see also Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991) ("When the claim underlying the administrative grievance involves a constitutional right, the prisoner's right to petition the government for redress is the right of access to the courts, which is not compromised by the prison's refusal to entertain his grievance.").

on the events complained of in the grievance or state an independent basis for a constitutional claim. For those reasons, Gillmore's claims against Defendants Quinn and Lamas will be dismissed because they are not plausible. *See Wilkerson v. Superintendent Somerset SCI*, 574 F. App'x 140, 142 (3d Cir. 2014) (per curiam) ("Wilkerson's claim that his grievance was mishandled was also properly dismissed.").

Gillmore also alleges that Quinn and Lamas ignored or mishandled his grievances to retaliate against him. "To state a claim for retaliation, a prisoner must allege that: (1) he was engaged in constitutionally protected conduct, (2) 'he suffered some adverse action at the hands of prison officials,' and (3) 'his constitutionally protected conduct was a substantial or motivating factor in the decision' to take that action." *Wisniewski v. Fisher*, 857 F.3d 152, 156 (3d Cir. 2017) (quoting *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001)) (internal quotations omitted). Here, Gillmore alleges in a conclusory fashion that Quinn and Lamas acted with a retaliatory motive, but he does not support his allegations of retaliation with facts. Furthermore, it is not clear from the Amended Complaint what conduct served as the basis for the claim that Quinn and Lamas retaliated against Gillmore. Accordingly, Gillmore has not stated a plausible retaliation claim against these Defendants. *See Santiago v. Warminster Twp.*, 629 F.3d 121, 133 (3d Cir. 2010) ("Allegations that are 'merely consistent with a defendant's liability' or show the 'mere possibility of misconduct' are not enough"); *See Iwanicki v. Pennsylvania Dep't of Corr.*, 582 F. App'x 75, 81 (3d Cir. 2014) (per curiam) (dismissal of retaliation claim was appropriate where plaintiff "failed to plead anything suggesting that the mishandling of his grievance was sufficiently adverse to deter him from exercising his rights").

At the end of his Amended Complaint, Gillmore speculates that Lamas retaliated against him after he filed his initial Complaint because he did not receive the Court's December 13

Memorandum and Order until December 27, 2019. (Am. Compl. ECF No. 9. at 18, ¶ 67.) This allegation is entirely conclusory and fails to state a plausible retaliation claim against Lamas.[6] *See Iqbal*, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."); *cf. Huertas v. Sobina*, 476 F. App'x 981, 984 (3d Cir. 2012) (per curiam) ("[T]he purported conduct—interfering with Huertas's personal mail, confiscating his photographs, and interfering with his receipt of funds—was not sufficiently adverse to deter a person of ordinary firmness from pursuing grievances.").

In sum, none of Gillmore's allegations state a plausible basis for a claim against Defendants Quinn and Lamas. As Gillmore has already been given leave to amend his claims against these Defendants, the Court concludes that further attempts at amendment would be futile. *See Jones v. Unknown D.O.C. Bus Driver & Transportation Crew*, 944 F.3d 478, 483 (3d Cir. 2019) (amendment by pro se prisoner would be futile when prisoner "already had two chances to tell his story").

### B. Claims Against Defendant Kenneth Eason

Gillmore has again failed to state a claim against Defendant Kenneth Eason. Gillmore alleges that Kenneth Eason failed to conduct an after-the-fact investigation of Gillmore's complaints after Gillmore discussed his experiences with Kenneth Eason following his release from the RHU. (Am. Compl. ECF No. 9 at 16, ¶ 61.) Gillmore also alleges that Kenneth Eason

---

[6] Gillmore's allegation of retaliation is based on his assertion that the Court's Memorandum is dated December 12, 2019, but that he did not receive a copy until December 27, 2019. However, the Memorandum was not filed until December 13, 2019 and was not entered on the docket until December 16, 2019. The Christmas holiday also likely slowed the mail. In any event, even if some delay occurred in delivering Gillmore's mail, he neither ties that fact to Lamas directly or to any retaliatory motive. Furthermore, Gillmore asked for and received an extension of time to file his Amended Complaint so he was not harmed in any way as a result of this delay.

11

should have known about the procedures used to hold him in the dry cell based on his high rank in the prison.

As previously noted, "an allegation of a failure to investigate, without another recognizable constitutional right, is not sufficient to sustain a section 1983 claim." *Graw v. Fantasky*, 68 F. App'x 378, 383 (3d Cir. 2003) (quotations omitted); *see also Boseski v. N. Arlington Municipality*, 621 F. App'x 131, 135 (3d Cir. 2015) (per curiam) ("Boseski has no cognizable claim against a government entity for its failure to investigate or bring criminal charges against another individual."); *Mitchell v. McNeil*, 487 F.3d 374, 378 (6th Cir. 2007) ("There is no statutory or common law right, much less a constitutional right, to an investigation."). Accordingly, Gillmore cannot state a claim against Kenneth Eason based on his failure to investigate events after they occurred. Additionally, Gillmore acknowledges in his Amended Complaint that Kenneth Eason was unaware of the policies or procedures used to hold Gillmore in the dry cell, yet he seeks to hold him accountable for those procedures, apparently based on his rank. That is not a sufficient basis for liability under § 1983. *See Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 320 (3d Cir. 2014) (explain that, for supervisory liability to attach, claims against a defendant must be based on his own misconduct or deliberate indifference to a known deficiency in a policy or procedure that violated the plaintiff's rights), *reversed on other grounds*, *Taylor v. Barkes*, 135 S. Ct. 2042 (2015).

In sum, Gillmore has not stated a plausible basis for a claim against Kenneth Eason. Again, as Gillmore was given leave to amend his claims against this Defendant but was unable to do so, he will not be given further leave to amend.

### C. Claims Against Bocco

Gillmore alleges that when he was in the RHU and Bocco was "doing a tour," he told Bocco about "the pain and [trauma] he just went through," to which Bocco responded that Gillmore was "our first victim" and made light of Gillmore's experience. (Am. Compl. ECF No. 9 at 14, ¶ 55.) "Verbal harassment of a prisoner, although distasteful, does not violate the Eighth Amendment." *Washington v. Rozich*, 734 F. App'x 798, 801 (3d Cir. 2018) (per curiam) (citing *McBride v. Deer*, 240 F.3d 1287, 1291 n.3 (10th Cir. 2001) and *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000)). While comments such as the one alleged may be unprofessional and inappropriate, they do not amount to constitutional violations. Bocco is not alleged to have been personally involved in Gillmore's placement in the dry cell or his treatment during those six days. As Bocco's verbal response to Gillmore does not state a plausible claim against Bocco. Gillmore will not be given leave to amend because amendment would be futile.

Gillmore also alleges that on November 9, 2019, Defendant Bocco retaliated against him for filing grievances and pursuing a lawsuit. In that regard, Gillmore claims that he was getting a legal aid book from another inmate when Bocco backed him into the cell, required him to strip naked, and made sexual gestures and comments about Gillmore's penis. (*Id.* at 17-18, ¶ 66.) Bocco also allegedly stated that Gillmore needed to "stay in [his] lane" and that he was "trying to sue the wrong people." (*Id.*) Based on these allegations, Gillmore may proceed on his retaliation claim against Bocco based on the events of November 9, 2019. *See Grohs v. Holmes*, Civ. A. No. 13-7870, 2014 WL 4896834, at *9 (D.N.J. Sept. 30, 2014) ("Mr. Grohs's allegations of the partial strip search conducted on June 2, 2013 could rise to the level of an adverse action." (citing cases)).

**D. Claims Against Remaining Defendants – Lorie Eason, Friend, Adams, White, Kaiser, Dunlap and Green**

The bulk of Gillmore claims concern his placement in the dry cell, the conditions in the dry cell, having been restrained in a manner that caused injury, and the denial of medical care for those injuries.[7] "[W]ithout some penological justification, an inmate may not be administratively confined in a dry cell." *Thomas*, 2020 WL 219036, at *4. In that regard, there must be at least some penological interest in placing the inmate in the dry cell and justifying the duration of the placement. *Id.* at *5.

Conditions of confinement violate the Eighth Amendment's prohibition on cruel and unusual punishment if they satisfy two criteria.[8] First, the conditions "must be, objectively, sufficiently serious" such that a "prison official's act or omission . . . result[s] in the denial of the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citations and internal quotation marks omitted). Second, the official responsible for the

---

[7] Although unclear, Gillmore may be bringing a claim against Lorie Eason based on his placement in the RHU and confinement there for 21 days. In the prison context, "[d]ue process protection for a state created liberty interest is . . . limited to those situations where deprivation of that interest 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Griffin v. Vaughn*, 112 F.3d 703, 706 (3d Cir. 1997) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)) "[C]onfinement in administrative or punitive segregation will rarely be sufficient, without more, to establish the kind of 'atypical' deprivation of prison life necessary to implicate a liberty interest." *Smith v. Mensinger*, 293 F.3d 641, 653 (3d Cir. 2002) (quoting *Sandin*, 515 U.S. at 486)). Accordingly, Gillmore has not stated a claim against Eason based on his placement in the RHU. *See Griffin*, 112 F.3d at 708 (holding that "exposure to the conditions of administrative custody for periods as long as 15 months falls within the expected parameters of the sentence imposed [. . .] by a court of law" and does not constitute a due process violation (quotation omitted)); *see also Williams v. Armstrong*, 566 F. App'x 106, 108 (3d Cir. 2014) (per curiam) (prisoner failed to allege liberty interest based on four-month placement in the RHU).

[8] It appears that Gillmore was a convicted and sentenced inmate at the time of the events in question, such that the Eighth Amendment governs his claims. *See Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012).

14

challenged conditions must exhibit a "sufficiently culpable state of mind," which "[i]n prison-conditions cases . . . is one of deliberate indifference to inmate health or safety." *Id.* "[E]ven though administrative confinement in a dry cell is unpleasant and often unsanitary, so long as the conditions of that confinement are not foul or inhuman, and are supported by some penological justification, they will not violate the Eighth Amendment." *Thomas*, 2020 WL 219036, at *3.

To state a constitutional claim based on the failure to provide medical treatment, a prisoner must allege facts indicating that prison officials were deliberately indifferent to his serious medical needs. *See Farmer*, 511 U.S. at 835. A prison official is not deliberately indifferent "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. "A medical need is serious, . . . if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotations omitted). Deliberate indifference has been found "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

"After conviction, the Eighth Amendment serves as the primary source of substantive protection in cases where an inmate challenges a prison official's use of force as excessive and unjustified." *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000). In the excessive force context, "the central question is 'whether force was applied in a good-faith effort to maintain or restore

15

discipline, or maliciously and sadistically to cause harm.'" *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). "In determining whether a correctional officer has used excessive force in violation of the Eighth Amendment, courts look to several factors including: (1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) 'the extent of injury inflicted'; (4) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them'; and (5) 'any efforts made to temper the severity of a forceful response.'" *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 327 (1986)).

Gillmore alleges that he was housed in a dry cell despite being subjected to a strip-search and x-ray that revealed he had not ingested contraband. He also alleges that he was held in the dry cell for approximately six days even though no contraband was found, that he was restrained in a manner that prevented him from moving, and that he was kept in cold temperatures, in constant illumination, and deprived of basic hygiene materials. At this early stage of the litigation, Gillmore may proceed on his claims against Defendants Lorie Eason, Friend, Adams, White, Kaiser, Dunlap, and Green based on their involvement in the events related to his placement in the dry cell, the use of force related to his placement in the dry cell, the conditions in the dry cell, and the alleged denial of medical care while he was in the dry cell.[9] *See Young v. Quinlan*, 960 F.2d 351, 365 (3d Cir. 1992) ("When viewed in their totality, the alleged actions of Lewisburg prison officials—not allowing Young to leave his cell more than once to defecate or urinate over a period of several days, not providing Young with a plastic urinal for 29 hours, not

---

[9] Gillmore's claim against Dunlap appears more akin to a failure to intervene based on his alleged knowledge of Gillmore's circumstances. *See Smith v. Mensinger*, 293 F.3d 641 (3d Cir. 2002) (acknowledging an officer's duty to intervene to protect a victim from another officer's use of excessive force "if there is a realistic and reasonable opportunity" to do so).

allowing Young to empty his urinal more than twice, not allowing Young to wash his hands before eating, not allowing Young to bathe or shower, not providing Young with toilet paper despite his diarrhea, not providing Young with water to drink, suggesting instead that he drink his urine, and the mocking taunts by guards and their threats to chain Young to a steel slab if he complained about his conditions—would if proved demonstrate a violation of the basic concepts of humanity and decency that are at the core of the protections afforded by the Eighth Amendment."), *superseded by statute on other grounds as stated in Nyhuis v. Reno*, 204 F.3d 65, 71 n.7 (3d Cir. 2000). The Complaint alleges and plausibly infers that these individuals were aware of and, at least to some extent involved in and responsible for the events and conditions that form the primary basis for Gillmore's claims. Gillmore has also alleged sufficient information about the events leading up to his placement in the dry cell, the conditions therein, the use of force against him, and the denial of treatment for his injuries to proceed at this time.

## IV. CONCLUSION

For the foregoing reasons, the Court will dismiss Gillmore's claims against Defendants Quinn, Lamas, and Kenneth Eason. The Court will also dismiss Gillmore's claims against Lori Eason based on his placement in the RHU and his retaliation claims, with the exception of his claims against Defendant Bocco based on the events of November 9, 2019. As previously noted, Gillmore will not be given another opportunity to amend because he was already permitted to amend these claims and further amendment would be futile. *See Jones*, 944 F.3d at 483.

However, Gillmore may proceed on his claims against Defendants Lorie Eason, Friend, Adams, White, Kaiser, Dunlap, and Green, based on his placement in the dry cell, the conditions in the dry cell, the use of force against him during this period, and the failure to provide medical treatment during this time. Gillmore may also proceed on his retaliation claim against Defendant

17

Bocco based on the events of November 9, 2019. The Court will direct service of the Amended Complaint on these Defendants. An appropriate Order follows.

**BY THE COURT:**

*/s/ C. Darnell Jones, II*
C. Darnell Jones, II   J.