## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARSHALL GILLMORE                           :
        *Plaintiff*,


       v.                                :

MARIROSA LAMAS, Superintendent, SCI
Chester; LORIE EASON, Security Captain,     :
SCI Chester; DAVID FRIEND, Lieutenant,          CIVIL ACTION
SCI Chester; NEECE, Captain, SCI Chester;        NO. 19-5571
B. ADAMS, Lieutenant, SCI Chester;          :
A. WHITE, Lieutenant, SCI Chester;
C. KAISER, Lieutenant, SCI Chester;
K. KAISER, Lieutenant, SCI Chester;         :
C. DUNLAP, Sergeant, SCI Chester;
B. GREEN, Registered Nurse, SCI Chester; and,
P. BOCCO, Lieutenant, SCI Chester           :
        *Defendants*.


## MEMORANDUM

**JONES, II   J.**                                            **December 10, 2021**


## I.   INTRODUCTION

Plaintiff Marshall Gillmore, a prisoner incarcerated at the State Correctional Institution in

Chester, Pennsylvania (SCI Chester), filed a Second Amended Complaint alleging claims

pursuant to 42 U.S.C. §1983 and Pennsylvania state law. Specifically, Plaintiff is suing eleven

prison officials on the basis of treatment he received while housed in a dry cell for a four-day

period.[1] Defendants—except for Nurse Green—filed the instant Motion to Dismiss Counts II

---

[1] Plaintiff's claims are for Conditions of Confinement (Count I), Excessive Force (Count II), Deliberate Indifference to Serious Medical Needs (Count III), Failure to Intervene (Count IV), Supervisory Liability (Count V), Retaliation (Count VI), and Intentional Infliction of Emotional Distress (Count VII).

through V and VII under Federal Rule of Civil Procedure 12(b)(6).[2] For the reasons set forth below, Defendants' Motion to Dismiss Counts III and VII shall be granted; the Motion to Dismiss Counts II,  IV and V shall be denied; and, the Motion to Dismiss Plaintiff's request for declaratory judgment shall be granted.

## II.    BACKGROUND

Plaintiff alleges that while housed as an inmate at SCI Chester on August 4, 2019, two correctional officers—who are not named as Defendants—searched him for contraband. (Sec. Am. Compl. ¶ 22.)  Although no illegal items were found, Plaintiff was subsequently strip-searched, handcuffed, and underwent an x-ray scan. (Sec. Am. Compl. ¶¶ 24-30.) Neither the strip-search nor the x-ray revealed any contraband; however, Defendant Lorie Eason ordered Defendant David Friend to transport Plaintiff to a dry cell.[3] (Sec. Am. Compl. ¶ 38.) Plaintiff's placement in the dry cell was documented by Defendant C. Kaiser on a DC-141 form (report of misconduct), which was then reviewed, approved, and signed by Defendant Neece. (Sec. Am. Compl. ¶¶ 41-43.)

---

[2] In the cover page to their motion, Moving Defendants refer to Fed.R.Civ.P. 12(b)(1) as a basis for dismissal.  (ECF No. 27 at 2.)  However, their Brief is devoid of any discussion regarding this issue.  Accordingly, this Court shall only address Movants' 12(b)(6) claims.

[3] As explained by the United States Court of Appeals for the Third Circuit:

> A "dry cell" is a cell that lacks water—all standing water has been drained from the toilet, the room's water supply has been shut off, and the sink and toilet have been capped to prevent inmate access. An inmate may be placed in a dry cell when prison staff have observed the inmate attempt to ingest an item of contraband or they learn that the inmate is attempting to introduce contraband into the prison. Dry cells are used to closely observe the inmate until natural processes allow for the ingested contraband to be retrieved. To this end, dry cells lack all linens and moveable items other than a mattress, inmates' clothes are exchanged for a simple smock, and their movements are carefully controlled to prevent them from concealing or disposing of any retrievable contraband.

*Thomas v. Tice*, 948 F.3d 133, 137 (3d Cir. 2020).

Plaintiff was held in the dry cell for over four days. (Sec. Am. Compl. ¶ 63.) He describes that he was forced to wear a paper-thin smock and was restrained with shackles on his ankles and hands.  (Sec. Am. Compl. ¶ 54.) Plaintiff alleges he was forced to urinate into a plastic container and defecate into a pan while squatting. (Sec. Am. Compl. ¶ 65.) Officers would then search through his feces but never found contraband at any point during his confinement. (Sec. Am. Compl. ¶¶ 66-68.) Plaintiff alleges the dry cell smelled strongly of urine and feces, and that the room was stained with what appeared to be bodily fluids and mold. (Sec. Am. Compl. ¶¶ 55-57.) Plaintiff reports the dry cell was so cold that it left him shivering, and he became sleep deprived because the lights were never turned off. (Sec. Am. Compl. ¶¶ 61-64.) Plaintiff also alleges he was not permitted to wash himself or otherwise engage in any form of personal hygiene. (Sec. Am. Compl. ¶¶ 69-71.)

Plaintiff contends that over the course of the four days he spent in the dry cell, Defendants Friend, Adams, White, K. Kaiser, Dunlap, and Green each entered his cell multiple times but did nothing to improve his living conditions. (Sec. Am. Compl. ¶ 76.) During these encounters, Plaintiff told the aforementioned corrections officials about the pain he was experiencing from the shackles and alleges he requested that changes be made. (Sec. Am. Compl. ¶¶ 78-79.) Plaintiff was periodically permitted to engage in "range and motion;" ten-second intervals where his restraints were removed. (Sec. Am. Compl. ¶ 82.) On one such occasion, Plaintiff reports Nurse Green observed that Plaintiff's feet were swollen, he was in excruciating pain, and he was shivering from the cold. (Sec. Am. Compl. ¶ 88.)

On August 9, 2019, Plaintiff was transported to the Restricted Housing Unit ("RHU") and was again scanned for contraband. (Sec. Am. Compl. ¶ 102.) The scan did not reveal the presence of contraband. (Sec. Am. Compl. ¶ 107.) On August 10, 2019, Defendant Green visited

Plaintiff in the RHU, at which point Plaintiff reported to her that his thumbs were numb and his back ached badly. (Sec. Am. Compl. ¶¶ 112-13.)

Plaintiff alleges Defendants caused lasting harm by exposing him to the conditions of the dry cell for several days. In particular, Plaintiff reports waking up in the middle of the night with cold sweats, experiencing nightmares, and having a general fear of going to sleep at night. (Sec. Am. Compl. ¶¶ 117-18.) A prison mental health professional told Plaintiff he was exhibiting symptoms of Post-Traumatic Stress Syndrome (PTSD), and prescribed a medication called Minipress for the symptoms. (Sec. Am. Compl. ¶¶ 119-21.) Plaintiff further claims he still experiences thumb numbness and back pain. (Sec. Am. Compl. ¶¶ 125-28.)

Lastly, Plaintiff alleges he faced retaliation from Defendants Bocco and Eason because he filed numerous grievances between August and September 2019 regarding his confinement in the dry cell.  (Sec. Am. Compl. ¶ 149.) In particular, on November 9, 2019, while he was retrieving a legal aid book from a fellow inmate, Plaintiff alleges Defendant Bocco forced him to strip naked in front of the other prisoner and then proceeded to direct sexual gestures and comments towards Plaintiff. (Sec. Am. Compl. ¶¶ 152-59.) On February 20, 2020, Defendant Eason confronted Plaintiff in the prison yard about his pending lawsuit against her and allegedly threatened to transfer him to another prison—further away from his family—if he continued to pursue the lawsuit. (Sec. Am. Compl. ¶¶ 166-68.)

## III.   STANDARD OF REVIEW

When reviewing a Rule 12(b)(6) motion, district courts must first separate legal conclusions from factual allegations. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Legal conclusions should be discarded, and well-pled facts given the deference of truth. *Id.* at 210-211. Courts must then

determine whether the well-pleaded facts state a "plausible claim for relief." *Id*. at 211.

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, [will] not suffice." *Iqbal*, 556 U.S. at 678 (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler*, 578 F.3d at 211 (citing *Phillips*, 515 F.3d at 231).

## IV.   DISCUSSION

Plaintiff raises constitutional claims pursuant to 28 U.S.C. § 1983 based on his placement in the dry cell, the conditions in the dry cell, the manner in which he was restrained, the denial of medical care while he was in the dry cell, the failure of certain Defendants to respond to his plight, the responses to his grievances, and alleged retaliation in various forms. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). "A defendant in a civil rights action must have personal involvement in the alleged wrongs" for liability to attach under § 1983. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *see also Iqbal*, 556 U.S. at 676 (explaining that, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

**A. Excessive Force**

Plaintiff brings an excessive force claim against all Defendants except Lamas and Bocco for the manner in which he was restrained while confined in the dry cell. (Sec. Am. Compl. ¶ 177.) Defendants C. Kaiser and Neece seek dismissal from the excessive force claim, arguing that because neither officer physically applied restraints to Plaintiff, neither had the personal involvement required to sustain a §1983 claim. (Defs.' Mot. Dismiss 12.)

"After conviction, the Eighth Amendment serves as the primary source of substantive protection in cases where an inmate challenges a prison official's use of force as excessive and unjustified." *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000). In the excessive force context, "the central question is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)).  It is well settled that . . .

> In determining whether a correctional officer has used excessive force in violation of the Eighth Amendment, courts look to several factors including: (1) "the need for the application of force"; (2) "the relationship between the need and the amount of force that was used"; (3) "the extent of injury inflicted"; (4) "the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them"; and (5) "any efforts made to temper the severity of a forceful response."

*Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 327 (1986)).

With that said, "[a] defendant in a civil rights action 'must have personal involvement in the alleged wrongs to be liable,' and 'cannot be held responsible for a constitutional violation which he or she neither participated in nor approved.'" *Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007) (quoting *Sutton v. Rasheed*, 323 F.3d 236, 249 (3d Cir. 2003); C.H. ex rel. Z.H. v. Oliva, 226 F.3d 198, 201 (3d Cir. 2000)). Although personal involvement is clearly established through participation, it can also be shown through allegations of "actual knowledge and

acquiescence," when made with "appropriate particularity." *Rode*, 845 F.2d at 1207-08. In the civil rights context, a Complaint is sufficiently specific when it provides information such as the offending conduct, time, place, and identity of the responsible parties. *See Hall v. Pa. State Police*, 570 F.2d 86, 89 (3d Cir. 1978).

Here, Plaintiff has sufficiently alleged Defendants C. Kaiser and Neece had knowledge of, and acquiesced to, the purported use of excessive force. As a Lieutenant, Defendant C. Kaiser was necessarily aware of the dry cell policy implemented at SCI Chester.  Regardless, on the afternoon of August 5, 2019, without any information regarding the existence of contraband on or in Plaintiff, said Defendant completed paperwork for Plaintiff to be transferred to a dry cell. (Sec. Am. Compl. ¶¶ 22, 41-42.) Similarly, on that same day, Defendant Neece reviewed and approved said paperwork, despite possessing knowledge that neither the strip search nor the body scanner had revealed the existence of any contraband. (Sec. Am. Compl. ¶¶ 22, 43.) Plaintiff concludes that these facts, when combined with these Defendants' knowledge of the dry cell policies and practices at SCI Chester, raise "the obvious inference" that C. Kaiser and Neece knew he would be shackled in a manner that constitutes excessive force. (Pl.'s Mot. Resp. 21.) This Court agrees.  Accordingly, Defendants' Motion to Dismiss Count II against Defendants Neece and C. Kaiser shall be denied.

### B. Deliberate Indifference to Serious Medical Needs

Plaintiff alleges that all Defendants except Lamas and Bocco were deliberately indifferent to three specific medical needs: his bipolar disorder, the physical pain from his restraints, and the psychological harm resulting from his confinement in the dry cell. (Sec. Am. Compl. ¶¶ 179-80.) All Defendants named in Count III, except for Nurse Green,[4] move to be

---

[4] Eason, Friend, Neece, Adams, White, C. Kaiser, K. Kaiser, and Dunlap.

dismissed from the deliberate indifference to serious medical needs claim. (Defs.' Mot. Dismiss 11.)

To state a constitutional claim based on a failure to provide medical treatment, a prisoner must allege facts indicating that prison officials were deliberately indifferent to his serious medical needs. *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994). "A plaintiff . . . must show that (1) he had a serious medical need, (2) defendants were deliberately indifferent to that need, and (3) the deliberate indifference caused harm or physical injury to the plaintiff." *DeJesus v. Delaware through Delaware Dep't Corr.*, 833 F. App'x 936, 940 (3d Cir. 2020) (footnotes omitted). "A medical need is serious . . . if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotations omitted). Deliberate indifference has been found "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

Plaintiff herein has sufficiently alleged his bipolar disorder constituted a serious medical need. Plaintiff alleged that he was diagnosed with Unspecified Bipolar Disorder and ADHD prior to entering the DOC. (Sec. Am. Compl. ¶ 18.) Further, he was prescribed the medication Trazodone as treatment, which he was taking regularly prior to his dry cell confinement (Sec. Am. Compl. ¶ 21.) Nevertheless, Plaintiff has failed to provide factual assertions showing the moving Defendants were deliberately indifferent. Plaintiff asserted he did not receive Trazodone, or any other medication, during the entirety of his four-day confinement period in the dry cell.

(Sec. Am. Compl. ¶ 92.)  However, he did not establish that Defendants Eason, Friend, Neece, C. Kaiser, K. Kaiser, or Dunlap knew he was diagnosed with bipolar disorder or that he required medication. Plaintiff does allege that Defendants Adams and White knew he needed medication based on seeing him in the medication line prior to his transfer to the dry cell. (Sec. Am. Compl. ¶ 94.) Even if that was true, Plaintiff failed to allege that they intentionally refused, delayed, or prevented him from receiving his medication. Therefore, Plaintiff's deliberate indifference claim regarding his bipolar disorder fails.

Next, although Plaintiff has sufficiently alleged the pain from his restraints constituted a serious medical need, he failed to adequately allege Defendants were deliberately indifferent to that need. Because this issue did not involve a diagnosis, Plaintiff's pain must have been so obvious that even a lay person could easily recognize that he needed the attention of a physician. Plaintiff alleged that he was restrained in a visibly painful way: his legs were shackled together, a metal chain was wrapped around his waist with the lock positioned into his back, and his hands were handcuffed and zip tied back-to-back.  (Sec. Am. Compl. ¶¶ 48-53.) He also alleged that he told Defendants Friend, Adams, White, K. Kaiser and Dunlap that the shackles were causing him pain. (Sec. Am. Compl. ¶ 79.) However, Plaintiff does not allege that any of the defendants moving for dismissal of this claim personally observed any *obvious* physical effects from the shackling.[5]

Although it is plausible that a factfinder could conclude Plaintiff's pain constituted a serious medical need, he has not properly alleged that the corrections officers intentionally

---

[5] Plaintiff only alleges that Nurse Green saw that his feet were swollen from the shackles. (Sec. Am. Compl. ¶ 88). By the time Nurse Green approached Plaintiff to photograph his feet, the swelling had already subsided. (Sec. Am. Compl. ¶ 112.)  Again, Nurse Green is not seeking dismissal of this claim.

refused, delayed, or prevented him from receiving medical treatment. Plaintiff did not request that his shackles be removed, nor did he request treatment for his alleged injuries. On the contrary, Plaintiff concedes his restraints were removed periodically for "range and motion" exercises. (Sec. Am. Compl. ¶ 82.) Accordingly, Plaintiff's deliberate indifference claim regarding his pain from the shackles is deficient.

Finally, Plaintiff asserts Defendants were deliberately indifferent to the psychological harm he endured while confined in the dry cell. Although Plaintiff was diagnosed with symptoms of PTSD by a prison mental health professional, he only started exhibiting these symptoms *after* his release from the RHU. (Sec. Am. Compl. ¶¶ 117-19.) Plaintiff concedes that at that point in time, he received medication to treat his PTSD symptoms. (Sec. Am. Compl. ¶¶ 121, 124.) Plaintiff does not allege that he requested, or was denied, any medical assistance for his mental health while confined in the dry cell. Thus, Plaintiff's deliberate indifference claim for psychological harm also fails.

Because Plaintiff has failed to plead a valid claim for deliberate indifference to serious medical need, Defendants' motion to dismiss Claim III shall be granted on behalf of Defendants Eason, Friend, Neece, Adams, White, C. Kaiser, K. Kaiser and Dunlap.

### C. Failure to Intervene

Defendants (with the exception of Lamas and Bocco) next seek dismissal of Plaintiff's cause of action for failure to intervene.  (Sec. Am. Compl. ¶¶ 182-83.)  Corrections officers can be liable for failing to intervene when a constitutional violation takes place in their presence or within their knowledge and they have a "realistic and reasonable opportunity to intervene." *Smith v. Mensinger*, 293 F.3d 641, 650-51 (3d Cir. 2002). This duty to intervene does not depend on an officer's rank. *Id.* at 651. Therefore, officers—including lieutenants and sergeants following the

orders of the Superintendent—cannot escape liability by relying on their inferior rank, and senior

officers may be responsible for the actions of officers acting under their supervision if they

"knew of and acquiesced" to such treatment. *Id.* at 650-51 (quoting *Baker v. Monroe Twp.*, 50

F.3d 1186, 1193 (3d Cir. 1995)). To that end,

> The approving silence emanating from the officer who stands by and watches as
> others unleash an unjustified assault contributes to the actual use of excessive
> force, and we cannot ignore the tacit support such silence lends to those who are
> actually striking the blows. Such silence is an endorsement of the constitutional
> violation resulting from the illegal use of force.  It is incompatible with the
> restrictions imposed under the Eighth Amendment, and is therefore unacceptable.
> We will not immunize such conduct by suggesting that an officer can silently
> contribute to such a constitutional violation and escape responsibility for it. The
> restriction on cruel and unusual punishment contained in the Eighth Amendment
> reaches non-intervention just as readily as it reaches the more demonstrable
> brutality of those who unjustifiably and excessively employ fists, boots or clubs.
>
> Although our case law refers to police officers, not corrections officers, this does
> not change our analysis.  Both are law enforcement officers, both are sworn to
> uphold the law, and both are authorized to use force (even deadly force) toward
> that end. We are, of course, aware of the obvious security concerns inside the
> close confines of a prison. However, that is simply one factor that must be
> considered in determining if a particular application of force is reasonable. It does
> not suggest a different Eighth Amendment inquiry for corrections officers as
> opposed to police officers. The law does not allow either to condone or cover up
> the use of excessive force. Similarly, neither can escape liability by turning either
> a blind eye or deaf ear to the illegal conduct of their colleagues.

*Smith*, 293 F.3d at 651-652.

As previously discussed, this Court has determined valid constitutional violations—

namely, conditions of confinement[6] and excessive force—are plausible in this case.  (ECF No.

15 at 14-18.)  In view of the facts sets forth in Plaintiff's Second Amended Complaint, this Court

further finds Lieutenants Friend, Adams, White, K. Kaiser and Sergeant Dunlap had a reasonable

---

[6] This Court previously determined Plaintiff's Conditions of Confinement claim was sufficient,
therefore Defendants do not currently seek dismissal of same (Count I of Second Amended
Complaint) for purposes of the instant Motion.

opportunity to intervene and failed to do so.  Plaintiff alleges each of these defendants entered Plaintiff's dry cell multiple times while he was restrained by shackles. (Sec. Am. Compl. ¶ 76.) When doing so, said officers had to cover their noses because of the foul odor in Plaintiff's cell. (Sec. Am. Compl. ¶ 77.)  More importantly, over the course of four days, Plaintiff told each of these officers the shackles were causing him pain.  (Sec. Am. Compl. ¶ 79.)  Yet, none of these officers did anything to assist Plaintiff.  (Sec. Am. Compl. ¶ 76.)[7]

Courts in this district have found that the mere allegation that an officer was present and failed to act to prevent excessive force was sufficient to survive a motion to dismiss. *See Williams v. Whitaker*, Civil Action No. 16-6379, 2020 U.S. Dist. LEXIS 42572, at *15-17 (E.D. Pa. March 10, 2020) (finding corrections officer sitting in passenger seat of prisoner transport vehicle had duty to intervene when the officer operating the vehicle was driving recklessly and inmate was imploring him to not do so); *Burk v. Budd*, No. 18-04702, 2019 U.S. Dist. LEXIS 134238, at *14 (E.D. Pa. Aug. 9, 2019) (denying a motion to dismiss a failure to intervene claim against two correctional officers because they were present while a third officer sexually abused defendant inmate); *Ferrara v. Delaware Cty.*, No. 18-CV-05157, 2019 U.S. Dist. LEXIS 104207, at *15 (E.D. Pa. June 21, 2019) (finding that a pretrial detainee had sufficiently stated a claim against correctional officer defendants because they were present and stood idly by while he was assaulted by another officer). In light of the facts set forth in Plaintiff's Second Amended Complaint, this Court finds Plaintiff has adequately pleaded claims of failure to intervene against these five officers.

---

[7] Plaintiff alleges Defendant Dunlap expressly acknowledged the dry cell procedures being utilized against Plaintiff were not appropriate but did nothing in response.  (Sec. Am. Compl. ¶¶ 80-81.)

With respect to Plaintiff's failure to intervene claims against Defendants Eason, C. Kaiser and Neece, said individuals were responsible for ordering Plaintiff's transfer to the dry cell, completing the paperwork, and reviewing and approving the transfer. (Sec. Am. Compl. ¶¶ 38-43.) As discussed above, when assessing a claim such as this, the court must remain mindful that "[a] defendant in a civil rights action 'must have personal involvement in the alleged wrongs to be liable,' and 'cannot be held responsible for a constitutional violation which he or she neither participated in nor approved.'" *Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007) (quoting *Sutton v. Rasheed*, 323 F.3d 236, 249 (3d Cir. 2003); *C.H. ex rel. Z.H. v. Oliva*, 226 F.3d 198, 201 (3d Cir. 2000)). Utilizing this standard, this Court finds that although Plaintiff has not alleged these particular defendants ever entered Plaintiff's dry cell or observed him in his restraints, he has alleged they did *initiate* and *approve* Plaintiff's transfer to the dry cell. As trained officers of SCI Chester, these Defendants were necessarily aware of what that would entail. Accordingly. Defendants' motion to dismiss Claim IV shall be denied.

### D. Supervisory Liability

Defendant Lamas seeks dismissal of Plaintiff's supervisory liability claim on two bases: (1) lack of merit; and, (2) law of the case doctrine. (Defs.' Mot. Dismiss 8.) With respect to her argument that Plaintiff's claim lacks merit, this Court notes that two theories of supervisory liability are potentially applicable in this case. First, "policymakers may be liable under § 1983 if it is shown that such defendants, 'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm.'" *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989)). "[T]he plaintiff must identify a specific policy or practice that the supervisor failed to employ and show

that: (1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 134 (F. Cir. 2010) (citing *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)). Second, "a supervisor may be personally liable under § 1983 if he or she "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinate's violations." *Id.* (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1190-91 (3rd Cir. 1995)).

Plaintiff herein has sufficiently alleged a supervisory claim against Defendant Lamas as a policymaker. First, Plaintiff alleged Lamas was the highest ranking official at SCI Chester and possessed oversight and operational responsibilities of the prison. (Sec. Am. Compl. ¶ 5.) Further, Plaintiff alleged it was Lamas who established the SCI Chester dry cell policies and practices, and that these policies and practices were divergent—in a harmful way—from the generally accepted DOC procedures.  (Sec. Am. Compl. ¶¶ 133-140.)  As such, the dry cell policies and practices carried out at SCI Chester created an unreasonable risk to inmates. (Sec. Am. Compl. ¶¶ 129-139.) Plaintiff specifically alleged that DOC policy did not authorize handcuffing hands back-to-back, the use of ankle shackles, zip ties, or waist chains. (Sec. Am. Compl. ¶ 133.) Additionally, Plaintiff alleged the DOC policy did not allow dry cells to be constantly illuminated, did not withhold personal hygiene supplies, and did not keep cells at cold temperatures. (Sec. Am. Compl.  ¶¶ 134-39.)  Next, Plaintiff adequately pleaded facts showing Defendant Lamas was aware of this unreasonable risk and was indifferent thereto. Again, Defendant Lamas was the highest ranking official at SCI Chester at the time and possessed oversight and operational responsibilities for the prison. (Sec. Am. Compl. ¶ 5.) The added harm

to an already highly punitive procedure demonstrates Lamas' unreasonable indifference to the risk.  Finally, the injury sustained by Plaintiff was the alleged violation of his 8th Amendment rights and resultant PTSD.

In addition to the foregoing, as Superintendent of the facility, Defendant Lamas clearly had knowledge that her employees—Lieutenants Friend, Adams, White, K. Kaiser, and Sergeant Dunlap—would enforce SCI Chester's dry cell policy and by reason of same, acquiesced in her subordinate's violations.  Given the facts asserted, Plaintiff has adequately pled a supervisory claim against Lamas.

As an alternative argument in support of dismissal, Defendant Lamas argues the supervisory claim is barred by the law of the case doctrine because this Court previously dismissed all the claims against her and terminated her as a party to the case. (Mot. Dismiss 8; ECF No. 16.) The law of the case doctrine stands for the proposition that "when a court decides upon a rule of law, that decision should continue to govern the *same issues* in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983) (emphasis added). The purpose is to "maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." *Pub. Interest Research Grp. of New Jersey, Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997) (quoting Federal Practice and Procedure § 4478 at 788 (1981)). The doctrine governs the court's discretion and therefore does not "preclude [] reconsideration of previously decided issues in extraordinary circumstances such as where: (1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and would create manifest injustice." *In re City of Philadelphia Litig.*, 158 F.3d 711, 718 (3d Cir. 1998).

Contrary to Defendant Lamas' argument, the supervisory liability claim against her has not yet been decided by this Court. Plaintiff previously alleged Defendant Lamas violated his First Amendment right to be free from retaliation by ignoring his grievances. (First Am. Compl. ¶¶ 59, 85.) In contrast, the Second Amended Complaint alleged Defendant Lamas violated Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment. (Sec. Am. Compl. ¶¶ 184-91.) Therefore, the court is not deciding the "same issue" and the doctrine does not apply as a bar to Plaintiff's claim. Assuming *arguendo* the law of the case doctrine was applicable, Plaintiff offered new factual allegations that Lamas was responsible for the dry cell policy at SCI Chester. (Sec. Am. Compl. ¶¶ 140-46). New evidence is one of the "extraordinary exceptions" in which the Court may reconsider an issue. Accordingly, Defendants' motion to dismiss Count V shall be denied.

### E. Sovereign Immunity and Intentional Infliction of Emotional Distress

Plaintiff alleges Defendant Bocco is liable for intentional infliction of emotional distress (IIED) for ordering Plaintiff and another inmate strip down in front of each other and for then making sexual gestures and comments about Plaintiff's genitalia while condemning him for filing a lawsuit against prison personnel.  (Sec. Am. Compl. ¶¶ 154-59.)  Plaintiff further alleged he "felt violated and humiliated by Defendant Bocco's words and actions and the fact that he was made to strip in front of another prisoner."  (Sec. Am. Compl. ¶ 160.)  Defendant Bocco moves to dismiss Plaintiff's state law claim for intentional infliction of emotional distress on the basis that it is barred by sovereign immunity. (Defs.' Mot. Dismiss 8.)

Under Pennsylvania Law, employees of the Commonwealth are protected by sovereign immunity for acts performed within the scope of their duties. 1 Pa.C.S. § 2310. It is undisputed that Defendant Bocco, as a corrections officer at SCI Chester, is an employee of the

Commonwealth. Therefore, the issue of liability becomes whether Plaintiff adequately alleged that Defendant Bocco was acting outside the scope of his duties when he conducted the November 9, 2019 strip search.

Pennsylvania courts have consistently applied the Restatement to determine whether conduct is within the scope of employment for purposes of sovereign immunity. *Justice v. Lombardo*, 208 A.3d 1057, 1068 (Pa. 2019). Conduct is within the scope if "(a) it is of the kind he is employed to perform, (b) it occurs substantially within the authorized time and space limits, (c) it is actuated, at least in part, by a purpose to serve the master, and (d) if force is intentionally used by the servant against another, the force is not unexpected by the master." Restatement (Second) of Agency § 228(1) (1958). "We have long held that whether a particular act of an employee is within the scope of his employment is ordinarily a question of fact for the jury. We have explained that the only exception to this well-established rule is where neither the facts nor the inferences to be drawn from them are in dispute." *Justice*, 208 A.3d at 1068. "Moreover, because sovereign immunity is an affirmative defense . . . the defendant carries the burden at trial of proving that his conduct was within the scope of his employment." *Id.*

Here, Defendant Bocco has failed to show that his conduct throughout the strip-search on November 9, 2019, was entirely within the scope of his duties. Although performing strip-searches is part of Bocco's duties as a corrections officer, this fact alone does not entitle him to sovereign immunity for the entirety of his conduct during the encounter with Plaintiff. *See Id.* (clarifying that just because an employee's unauthorized conduct may be within the scope if it is "incidental" to some authorized conduct, this does not serve as a "catchall intended to give legal cover to all manner of unsanctioned behavior."). On the contrary, Plaintiff alleges facts that are plausibly outside the scope of a corrections officer's duties, including performing strip-searches

in front of other prisoners and making sexual gestures and comments. (Sec. Am. Compl. ¶¶ 152-60.) Plaintiff further alleges these acts were motivated by Defendant Bocco's personal motive to retaliate against Plaintiff for filing a grievance against him. (Sec. Am. Compl. ¶¶ 149-51.) Because the question of whether Defendant Bocco's conduct is within the scope of his employment is still very much in dispute, the defense of sovereign immunity does not extinguish Plaintiff's IIED claim.

Notwithstanding the foregoing, Plaintiff's IIED claim is deficient on the merits. The Pennsylvania Supreme Court has determined that a plaintiff asserting a claim of intentional infliction of emotional distress (IIED) must "demonstrate intentional outrageous or extreme conduct by the defendant, which causes severe emotional distress to the plaintiff." *Reeves v. Middletown Athletic Ass'n*, 866 A.2d 1115, 1122 (Pa. Super. Ct. 2004) (citing *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. Super. Ct. 1998)). Additionally, the plaintiff must suffer some physical harm because of the defendant's outrageous conduct. *Id.* at 1122-23. "'Outrageous or extreme conduct' has been defined by the appellate courts of this Commonwealth as conduct that is 'so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized society.'" *Id.* at 1122, n. 5. Courts must make the initial determination as to whether the defendant's conduct is extreme enough to allow the plaintiff to recover. *Swisher v. Pitz*, 868 A.2d 1228, 1231 (Pa. Super. Ct. 2005).

Plaintiff alleges Defendant Bocco forced him to strip in front of another incarcerated person, in violation of standard practices within the DOC. (Sec. Am. Compl. ¶¶ 154-55). Defendant Bocco was then alleged to have made sexual gestures and a lewd comment about the Plaintiff's genitalia (Sec. Am. Compl. ¶ 159.) Not only was this conduct intentional, but Plaintiff

also claims it was motivated by a desire for retaliation. (Sec. Am. Compl. ¶¶ 148-151.) Finally, Plaintiff alleges that this incident left him feeling violated and humiliated. (Sec. Am. Compl. ¶ 160). The bar for the level of extreme and outrageous conduct needed to sustain an IIED claim is very high. Although Defendant's conduct was certainly unprofessional and offensive, Plaintiff has failed to allege a physical harm resulting from the incident. As such, Defendant Bocco's motion to dismiss Count VII shall be granted.

### F. Declaratory Judgment

Finally, Defendants move to dismiss Plaintiff's request for declaratory relief on the basis that such a remedy is inappropriate based on the claims asserted. (Defs.' Mot. Dismiss 12-13.) "To have standing to sue for injunctive or declaratory relief, Plaintiff must be the person who will be injured by the future action sought to be enjoined." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). "The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Steffel v. Thompson*, 415 U.S. 452, 459 n. 10 (1974). "A prisoner's transfer or release from prison moots his claims for injunctive or declaratory relief since he is no longer subject to the conditions he alleges are unconstitutional." *Doss v. Dauphin Cty. Prison*, Civil No. 3:CV-14-0287, 552014 U.S. Dist. LEXIS 156725, at *5 (M.D. Pa Nov. 5, 2014) (citing *Abdul-Akbar v. Watson*, 4 F.3d 195, 206-07 (3d Cir. 1993), *Weaver v. Wilcox*, 650 F.2d 22, 27 (3d Cir.1981), and *Toney v. Bledsoe*, 427 F. App'x 74 (3d Cir.2011)). Here, Plaintiff's request for declaratory judgment is moot because he was released on parole on June 23, 2021.[8] As such, he is no longer subject to the dry cell confinement and retaliation he alleged was unconstitutional. Thus, declaratory relief is no longer an appropriate remedy and Defendants' motion to dismiss declaratory judgment shall be granted.

---

[8] *See* http://inmatelocator.cor.pa.gov and http://vinelink.com.

### G.      Amendment

Amendments to a Complaint may be made as a matter of course, but only if the amendment occurs within: "21 days after serving it, or . . . if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." FED. R. CIV. P. 15(a)(1).

Inasmuch as the conditions for amendment as a matter of course are absent here, amendment is only permitted by leave of court or with the written consent of the opposing party. FED. R. CIV. P. 15(a)(2). Leave must be freely granted "when justice so requires." *Id.*  However, leave may be denied where undue delay, bad faith, dilatory motive, prejudice, or futility are present. *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000). In examining futility, the legal standards of Rule 12(b)(6) must be applied. *Id.*

In this case, Plaintiff has had an opportunity to file *three* Complaints; two of which were drafted with the benefit of this Court's rulings regarding pleading deficiencies.  Plaintiff does not currently seek leave to amend a third time.  This Court finds that in light of its rulings herein and the procedural posture of this case, any further attempt to amend would be futile and would result in prejudice to Defendants.  Accordingly, dismissal of Plaintiff's claims shall be with prejudice.

**V.     CONCLUSION**

For the reasons set forth above, Defendants' Motion to Dismiss shall be granted as to

Counts III, VII and Plaintiff's declaratory judgment claim, and shall be denied as to Counts II,

IV and V.

An appropriate Order follows.


BY THE COURT:


/s/  C Darnell Jones, II    J.